IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALONZO GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-153 |
| | ) | |
| COUNTY OF DURHAM OFFICE OF | ) | |
| THE SHERIFF DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Alonzo Greene filed this lawsuit alleging that numerous officers at the Durham County jail violated his constitutional rights by throwing out his religious meal and then when he complained, beating him, stripping him of his pants, subjecting him to inhumane conditions in solitary detention, denying him medical treatment, and otherwise punishing him. Seven of the nine remaining defendants have filed a motion for summary judgment.

Because Mr. Greene has either failed to exhaust his administrative remedies or failed to produce evidence giving rise to disputed questions of material fact as to his claims against these defendants for "unsanitary and inhumane conditions," due process violations, and violations of the right to practice religion under both the First Amendment and under the Religious Land Use and Institutionalized Persons Act, those claims will be dismissed. However, Mr. Greene has raised disputed questions of material fact as to his claims against all of the moving defendants for deliberate indifference to a serious medical need, and against some defendants for excessive force, failure to supervise, and

retaliation. These claims, along with the claims against defendant P.D. Elliott, who did not move for summary judgment, will proceed to trial. The Court intends to dismiss the claim against Stanley Brown, who also did not move for summary judgment, unless Mr. Greene can show a legal basis for his claim.

Mr. Greene's motion titled "Plaintiff Pretrial in Limine Motion," (Doc. 99), will be denied as premature.

## I.     Background

In his original complaint, Mr. Greene asserted claims against Durham County jail officers arising out of events on August 21, 2011, while he was a pretrial detainee. (Doc. 2). On motions to dismiss by the defendants, the Court dismissed all claims against former Sheriff Worth Hill, Sheriff Michael Andrews, and the nurse P. Butler and dismissed the claims asserted against the named detention-officer defendants in their official capacities. (Docs. 22, 46).

Mr. Greene's motion to file an amended complaint was granted in part. (Doc. 68). His amended complaint clarifies that he asserts claims against officers P.D. Elliott, Edward Ross, Harry Minor, Comeshia Johnson, Michael Jones, Tara Holloway, Augustus Collier, Herschel Moore, and Stanley Brown. Officer Elliott is separately represented, is not a party to the other defendants' summary judgment motion, (Doc. 95), and has not filed for summary judgment.[1] Though represented by the same counsel as the remaining

---

[1] Officer Elliott was originally sued as "John Doe (aka 'Big E')," and the magistrate judge granted Mr. Greene's request to amend the complaint to change the name. (Doc. 68 at 4). Officer Elliott authorized the Durham County Sheriff to accept service of process on his behalf,

defendants, Sergeant Brown is not a party to the summary judgment motion, (Doc. 95), and has not otherwise filed for summary judgment.

## A. The Parties

The plaintiff Alonzo Greene was a pretrial detainee at the Durham County Detention Center during the times relevant to this lawsuit. (Doc. 2 at p. 3 ¶ 2). All of the defendants worked at the Durham County jail on August 21, 2011, the date of the incident at issue. More specifically, the evidence appears undisputed that:

- The defendant Sergeant Tara Holloway was a supervisor assigned to the fourth level, where Mr. Greene's cell was located, on the evening of August 21. (Doc. 96-1 at p. 9 ¶¶ 3-5).

- The defendant Staff Sergeant Augustus Collier was a supervising staff sergeant assigned to Pod 4D on August 21 and conducted an investigation into the use of force that night. (*Id.* at pp. 21, 23 ¶¶ 3-4, 10).

- The defendant Detention Officer Harry Minor was in Pod 4D that evening and was among the first to enter Mr. Greene's cell. (*Id.* at pp. 32-33 ¶¶ 3-4, 7).

- The defendant Detention Officer Herschel Moore was working with the Detention Emergency Response Team ("DERT"), (Doc. 96 at 4), conducting a random search of Pod 4D the evening of August 21. (Doc. 96-1 at p. 44 ¶¶ 3-4). He did not conduct the search of Mr. Greene's cell but did respond after the altercation

_____

(Doc. 69), and he was timely served at that address on September 24, 2015. (Doc. 75 at 3; *see also* Doc. 68 at 6 (extending time for service of process on Officer Elliott to October 10, 2015)). He timely answered the original complaint, raising six affirmative defenses. (Doc. 77).

began and participated in restraining Mr. Greene and later walking him to the medical unit. (*Id.* at pp. 44-46 ¶¶ 4, 7, 10, 13).

- The defendant Detention Officer Edward Ross was also assigned to DERT that night. (*Id.* at p. 55 ¶¶ 3-4). He did not conduct a search of either Mr. Greene or his cell, (*id.* at p. 56 ¶ 7), but he did respond to Mr. Greene's cell after the incident began and then helped escort him to the Special Housing Unit. (*Id.* at pp. 56-58 ¶¶ 7, 13).

- The defendant Sergeant Michael Jones was in Pod 4D on the evening of August 21, 2011, and responded to Mr. Greene's cell. (*Id.* at pp. 123-24 ¶¶ 3-4, 9).

- The defendant Detention Officer Comeshia Johnson was working in the Special Housing Unit on August 21, 2011, and saw Mr. Greene escorted into the unit by Officer Elliott and two other officers. (*Id.* at pp. 128-29 ¶¶ 3-4, 7).

- The defendant Disciplinary Hearing Sergeant Stanley Brown was not present in Pod 4D on August 21, 2011, but presided over Mr. Greene's disciplinary hearing two days later. (*Id.* at pp. 118-19 ¶¶ 4-6). As noted, he did not file for summary judgment.

- The defendant Officer P.D. Elliott responded to Mr. Greene's cell in Pod 4D and later escorted him to the Special Housing Unit. (*E.g.*, *id.* at p. 337; p. 129 ¶ 7). As noted, he did not file for summary judgment.

## B. The Evidence

In support of their motion for summary judgment, the defendants submitted eight affidavits of detention facility officers, a number of Mr. Greene's disciplinary and

4

medical reports, documents explaining detention facility policies, and an expert report on the use of force.[2]  The defendants also submitted eleven security camera videos that they assert corroborate their version of the facts.  Mr. Greene submitted an eighty-three page sworn declaration, two declarations from another detainee, and numerous medical and other records.  Both parties submitted answers to interrogatories.

### C.  Summary of Claims

In his amended complaint, (Doc. 58), Mr. Greene makes the following claims:

- Violations of his Fourteenth Amendment rights by: using excessive force against him (and related claims for failure to supervise or intervene), subjecting him to inhumane and unsanitary conditions, failing to provide adequate medical care, and depriving him of due process.  These constitutional claims are brought pursuant to 42 U.S.C. § 1983.

- Violations of his First Amendment rights in that the named officer-defendants deprived him of his right to practice his religion and retaliated against him for filing grievances.  These constitutional claims are brought pursuant to § 1983.

- Violation of his statutory rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq.

### D.  Standard of Review

---

[2] The expert report accepted as true the facts as the officers described them.  (Doc. 96-1 at 72).  At summary judgment, the Court must view the record in the light most favorable to the plaintiff as the non-moving party.  Mr. Greene has produced evidence contrary to the officers' facts as noted herein, and to the extent the report is based on material, contradicted evidence, the Court did not consider it.

Summary judgment should be granted if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial. *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 300-01 (4th Cir. 1998) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). The Court's role is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. At this stage, the Court views the record in the light most favorable to the plaintiff as the non-moving party. *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016).

## II.     Facts

Mr. Greene, a practicing Muslim, was observing Ramadan on August 21, 2011, and had been served his Ramadan meal at the regular detainee meal time hours before sunset. (Doc. 116-1 at ¶¶ 6-7). He broke his fast after the sun set at approximately 8 p.m.; however, he did not eat the entire meal at the precise moment the sun set. (*Id.* at ¶¶ 7, 24; pp. 5-6 note). At about 8:40 p.m. Mr. Greene exited his cell, which was located on the second level of Pod 4D, (Doc. 96-1 at p. 9 ¶ 5), for a routine search, (Doc. 116-1 at ¶ 11; Doc. 96-1 at p. 9 ¶ 4; Video "Pod 4D 1x1," timestamp 8:43), and proceeded with other detainees to the shower area for a strip search and body cavity search. (Doc. 116-1 at ¶¶ 10-11, 26). When Mr. Greene returned to his cell a few minutes later, (*see* Video

"Pod 4D 1," timestamp 8:47), he found that his religious, legal, and personal belongings had been "disarrayed and disrespected," and that his Quran was on the floor. (Doc. 116-1 at ¶¶ 29-31).

The defendants do not dispute the main thrust of Mr. Greene's recitation of the facts up to this point. However, the parties differ on how Mr. Greene reacted to the cell search and how the defendants then responded.

Incident in Cell

Mr. Greene states that upon his return to his cell, he immediately complained to Sergeant Holloway, the supervisor of Pod 4D, (Doc. 96-1 at p. 9 ¶ 4), about the disarray of his cell, asked for the names of the individual officers who had searched it, and informed Sergeant Holloway that he wished to file a grievance. (Doc. 116-1 at ¶¶ 30-31). Sergeant Holloway told him to wait and that she would "be back." (*Id.* at ¶ 31). Only after Sergeant Holloway left did Mr. Greene realize that the remainder of his Ramadan meal was missing. (*Id.*). He reported the missing meal to a detention officer through the intercom in his cell and to Sergeant Holloway when she returned to his cell. (*Id.* at ¶¶ 33-34). Sergeant Holloway told him the meal would not be replaced and that there was no other food to give him. (*Id.* at ¶ 34). He then tried calling out for other supervisors to help him. (*Id.* at ¶¶ 37-38).[3]

_____

[3] Mr. Greene's description of these initial conversations with Sergeant Holloway is inconsistent with the surveillance video footage. *See infra*.

Mr. Greene declares that Officer Minor then entered his cell and told him to step back. (*Id.* at ¶ 40). Mr. Greene says that when he complied, Officer Minor began hitting him in the chest and stomach, shoved him down onto the cement, and screamed at him. (*Id.* at ¶¶ 41-42). Mr. Greene denies clenching his fists, attempting to intimidate Officer Minor or any other detention officer, disobeying lawful orders, or swinging, striking, kicking, or attempting to hit Officer Minor or other officers. (*Id.* at ¶ 44). At some point Staff Sergeant Collier, Sergeant Jones, and Officers Ross, Moore, and Elliott, and possibly others, entered the cell, and Mr. Greene reports hearing an unspecified chorus of voices swearing at him and encouraging Officer Minor to beat him. (*Id.* at ¶¶ 45-46). Mr. Greene does not explain when or how this conduct ceased but next narrates attempting to explain to the officers that he had not disrespected Sergeant Holloway; explaining his objections to the strip search, to the treatment of his cell, and to the discarding of his food; and requesting prompt medical treatment and a probe into Officer's Minor actions. (*Id.* at ¶¶ 47-48). Mr. Greene asked for his inhaler but was not given it and was told not to move. (*Id.* at ¶ 49). He reports that the officers responded with more screaming and swearing and that he was then struck on the right side of the head by an officer he believes to be Officer Minor. (*Id.* at ¶¶ 51-53). Mr. Greene pleaded with Sergeant Holloway and another sergeant to intervene, but they did not, and Staff Sergeant Collier, Sergeant Jones, and Officers Ross, Moore, and others then rushed at him and kicked, punched, elbowed, pushed, pulled, and otherwise physically assaulted him as he curled up into a ball. (*Id.* at ¶¶ 54-56).

Mr. Greene declares that this attack "felt like hours," and when it stopped he was handcuffed and jerked painfully to his feet. (*Id.* at ¶ 57). His complaints that the cuffs were too tight were ignored. (*Id.* at ¶¶ 57-58). He repeated his requests for his inhaler and for medical attention. (*Id.* at ¶¶ 59-60).

Mr. Greene affirms that Officer Minor then started screaming again, that he was surrounded by approximately fifteen different guards, and that he was shoved around between Officers Ross, Moore, Minor, "and others," while Staff Sergeant Collier instructed them to teach him a lesson. (*Id.* at ¶¶ 61-63). Sergeant Jones threatened to kill Mr. Greene and then punched him so hard on the left side of his head that he was knocked unconscious. (*Id.* at ¶ 64). When Mr. Greene came to, he asked the defendants to pick him up off the cold floor and to retrieve his inhaler. (*Id.* at ¶ 65). Mr. Greene reports that Staff Sergeant Collier, Sergeant Jones, and Officers Ross, Moore, Minor, Elliott, and others then set to beating him again, and he again curled into a ball. (*Id.* at ¶¶ 66-67). The officers then lifted him up into the air and stripped him of his pants, boots, and socks, and twisted his shirt painfully around his neck while taunting him. (*Id.* at ¶ 68). Sergeant Holloway and other supervisors did not intervene. (*Id.* at ¶ 69). Mr. Greene "wound up on the cold floor" again, and Officer Elliott stomped the left side of his face and neck with Officer Elliott's shoe or boot. (*Id.* at ¶¶ 70, 73-74). Officer Elliott then dragged Mr. Greene by his shirt, which was still twisted like a rope around his neck and choking him, while Mr. Greene gasped and told Officer Elliott he could not breathe. (*Id.* at ¶¶ 75-78). Detainee Benjamin Reese affirmed that he saw Officer Elliott choke the

9

plaintiff with a shirt around his neck. (Doc. 117 at p. 20 ¶ 10; Doc. 118 at p. 63 ¶¶ 7, 9).[4] As they escorted Mr. Greene to the "hole," Officers Elliott, Minor, and Moore continued assaulting Mr. Greene "physically and mentally" while outside the view of the video cameras. (Doc. 116-1 at ¶¶ 74, 79). Officer Elliott screamed at Mr. Greene, using expletives, about whether Mr. Greene still wanted to file a grievance. (*Id.* at ¶ 79).

The surveillance videos do not show the inside of Mr. Greene's cell, so they can neither verify nor repudiate his version of events. However, the videos do clarify the timeline. Mr. Greene narrates over some forty paragraphs a series of physical attacks that he reports "felt like hours," (*id.* at ¶ 57; *see also* ¶¶ 40-79); however, the video shows that it could not have lasted even three minutes. An individual who appears to be wearing an orange shirt, presumably Mr. Greene, enters Mr. Greene's cell at approximately 8:47:30. (Video "Pod 4D 1"). About a minute later, an individual in a bright yellow shirt, worn by members of DERT, (*see* Doc. 96 at 4), approaches the door to Mr. Greene's cell and then walks away. (Video "Pod 4D 1," timestamp 8:48:28-34). Another officer approaches the cell a few seconds later, (*id.*, timestamp 8:48:40), and then approximately nine or ten additional officers congregate on Mr. Greene's cell and some apparently enter it. (*Id.*, timestamp 8:48:40-49:26). It is not clear from the video how many officers entered the cell and how many remained clustered in the doorway or outside the cell. At about

---

[4] Mr. Greene submitted two affidavits from Mr. Reese, one dated June 16, 2015, and the other dated January 19, 2016. (Docs. 118 at 63; 117 at 20). It is not clear why Mr. Greene submitted two affidavits with essentially the same information.

8:50:42, several individuals emerge from the cell, and the one in front appears to be Mr. Greene, as he is handcuffed and not wearing pants.  (*Id.*, timestamp 8:50:42-50).

The defendants submitted six declarations describing the incident in the cell, and they dispute Mr. Greene's version of the facts.  The officers deny that Mr. Greene was assaulted and deny that he was subjected to excessive force.  (Doc. 96-1 at p. 11 ¶ 12; p. 23-24 ¶ 13; pp. 34-35 ¶ 10; p. 45 ¶ 10; p. 46 ¶ 14; p. 58 at ¶¶ 15-16).  Rather, they assert that he initiated the encounter by yelling and cursing at officers over the loss of his meal and by kicking the door of his cell, conduct that they assert needed to be addressed to maintain order in the facility.  (*Id.* at pp. 10-11 ¶¶ 10-12; p. 23 ¶ 11; p. 33 ¶ 7; p. 35 ¶ 12; p. 44 at ¶¶ 6-9; p. 56 at ¶¶ 8-9).

Officer Minor declares that when he arrived in Mr. Greene's cell he bent over to pick up Mr. Greene's blanket off the floor, and when he rose up, Mr. Greene was leaning over him "in a combative stance with his hands clenched and his legs spread apart."  (*Id.* at pp. 33-34 ¶ 8; *see also* p. 124 ¶ 10 (referring to "a fighting stance")).  Officer Minor ordered Mr. Greene to step back, but he refused.  Officer Minor then put his hand on Mr. Greene's chest "to obtain some safety space," (*id.* at p. 124 ¶ 10; *accord* p. 34 ¶ 8), and Mr. Greene took a swing at him.  (*Id.* at p. 34 ¶ 8).

Officer Moore, Officer Ross, and Sergeant Jones each describe the ensuing use of force as follows:  Officer Moore "restrained Detainee Greene by the upper torso" for the purpose of ensuring officer safety and to facilitate handcuffing Mr. Greene.  (*Id.* at p. 45 ¶ 10).  Though Mr. Greene resisted being handcuffed, Officers Moore and Ross held him down and cuffed him.  (*Id.* at p. 45 ¶¶ 9-10; p. 57 ¶ 11; p. 125 ¶ 11).  Officers Elliott,

Minor, and Moore then escorted Mr. Greene to the Special Housing Unit. (*E.g.*, *id.* at p. 125 ¶ 11). All the officers report that the incident took about two minutes, which the video corroborates. (*See* Video "Pod 4D 1," timestamp 8:48:40-8:50:42).

<u>The Special Housing Unit</u>

All the witnesses agree that Mr. Greene was taken from his cell in Pod 4D to the Special Housing Unit ("SHU"). The surveillance footage shows that officers converged on Mr. Greene's original cell at about 8:49, (*see* Video "Pod 4D 1," timestamp 8:48:40-49:26), and Mr. Greene was placed in a cell in Pod 3C in SHU at 8:55 p.m. (Video "Pod 3C North 1," timestamp 8:55:00). A little after 10 p.m., an officer returned to Mr. Greene's cell holding an orange garment. (*Id.*, timestamp 10:09:40). Two additional officers arrive, and after a few moments, the three officers and Mr. Greene, now wearing pants, emerged from the cell and proceeded to the medical unit. (*Id.*, timestamp 10:09:54-10:10:32; *see also* videos "Medical Corridor" and "Medical Entrance"). Therefore, the videos show that the total time from the alleged assault to the time Mr. Greene received medical attention was approximately an hour and twenty minutes.

Mr. Greene affirms he was left in SHU without pants,[5] a mattress, sheets, footwear, toilet paper, or a drinking cup. (Doc. 116-1 at ¶ 82). He was still handcuffed

---

[5] Mr. Greene says he was "naked," apparently because while he still had his shirt, it was twisted like a rope around his neck and therefore doing little to cover him. (Doc. 116-1 at ¶¶ 82, 77). The video quality is too poor to be certain, but it appears Mr. Greene was wearing only white briefs as he was escorted out of Pod 4D. (*See* Video "Pod 4D 2," timestamp 8:51:08-10). However, moments later, when he has been led into the hallway captured in the video titled "Pod 4D Corridor," a better quality video shows that his shirt is being worn normally. (Video "Pod 4D Corridor," timestamp 8:51:19-23).

behind his back. (*Id.*). His cell was "dirty, filthy, and extremely frigid"[6] and lacked a functioning toilet. (*Id.*). Officers Minor, Elliott, Moore, and another officer told him that if he continued to pursue complaining and filing grievances he would "have problems." (*Id.* at ¶ 83). Mr. Greene asked Officer Johnson, who was on duty in SHU, (Doc. 96-1 at p. 128 ¶ 4), to loosen his handcuffs, to retrieve his inhaler from his former cell, and for medical attention, and informed her he needed to use the toilet. (Doc. 116-1 at ¶ 85). He repeated these requests at least twice more. (*Id.* at ¶¶ 88-89).

Mr. Greene reports that two hours later Officers Moore and Ross returned to the cell to escort him to medical. (*Id.* at ¶ 90). However, as noted, the surveillance videos show that Mr. Greene was only in the cell on the 3CN block for seventy-five minutes before he was taken to medical. (Video "Pod 3C North 1," timestamps 8:55, 10:10). He declares that they told him that if he did not seek medical attention he would probably not receive an infraction. (Doc. 116-1 at ¶ 90). He nonetheless requested medical attention. (*Id.*). The officers brought him pants and re-cuffed him so that his hands were in front. (*Id.* at ¶ 91). Mr. Greene states that he washed the blood off his face and from his nose and mouth before leaving. (*Id.* at ¶ 93).

Mr. Greene reports that when he returned to the cell after going to the medical unit, he still lacked a mattress, linens, food, shoes, pain relievers, and his inhaler, (*id.* at ¶ 100), and was only moved to a more hospitable cell hours later after complaining

---

[6] Mr. Greene attests that different cells within the facility are colder than others and that officers know which cells are cold and will punish a detainee by placing him in one of the cold cells. (Doc. 116-1 at p. 45 note).

numerous times.  (*Id.* at ¶ 111).  He reports that he was in the first cell for hours with his handcuffs still on.  (*Id.* at ¶ 109).

The defendants do not directly dispute many of these facts.  Officer Johnson denies speaking to Mr. Greene and denies that he asked her for any assistance or food.  (Doc. 96-1 at p. 129 ¶ 7).  She denies that he requested medical attention.  (*Id.* at p. 197).  Officer Minor states that Mr. Greene's handcuffs were removed once he was inside the cell in SHU.  (*Id.* at p. 35 ¶ 13).  Officers Minor and Moore state they did not "take any retaliatory actions" against Mr. Greene.  (*Id.*; *see also* p. 47 ¶ 18).  The defendants additionally point out that the video shows that Mr. Greene was not in SHU awaiting medical care for as long as he says he was.  (Doc. 96 at 17).

As to the conditions of Mr. Greene's cell, Officer Johnson stated in response to interrogatories that she has no memory of Mr. Greene moving between cells in SHU.  (Doc. 96-1 at pp. 202-03).  She further stated:  "All cells have a mattress only.  Proper procedure is that detainees are not allowed personal belongings until the cell has been search [sic] by a 3C Pod Officer.  After the cell has been searched detainees are allowed property bags, which are also searched, that contain sheets and blankets."  (*Id.* at p. 202).  She does not explain how long this process usually takes, how long it took in Mr. Greene's case, nor does she address his other complaints about the cell's condition.

<u>The Medical Unit</u>

14

The video shows Mr. Greene arriving in the medical unit a little after 10 p.m. (Video "Medical Entrance," timestamp 10:08:11-16).[7]  No apparent injuries can be seen on the video, but its quality is low and the segment is very brief.  Mr. Greene affirms he was seen by a member of the medical staff.  (Doc. 116-1 at ¶ 95).  Mr. Greene says he complained of ringing in the ears, blurred vision, shortness of breath, dizziness, nausea, extreme pain, hurting and throbbing head, body aches, shoulder pain, wrist pain, and tingling in the arms and fingers.  (*Id.*).  He informed the medical staff member that he had vomited and asked for an inhaler.  (*Id.*).  Mr. Greene objects to the medic's "nasty attitude" and "facial smirks" and says that he gave Mr. Greene an ice pack and administered an inhaler without doing a full physical examination.  (*Id.* at ¶¶ 96-97).  He asserts that the medical staffer explained that he did not want any "trouble on the job." (*Id.* at ¶ 97).

Mr. Greene declares that the injury report form he first filled out was destroyed because it contained information incriminating to the officers and that he refused to sign a second form that misrepresented the facts.  (*Id.* at ¶¶ 101-02).

Mr. Greene reports that sometime later, he was seen by a different medical provider and diagnosed with a concussion.  (*Id.* at ¶¶ 127, 129, 142).  The progress notes from the jail actually say "head trauma."  (Doc. 118 at 100).  Mr. Greene reports that he was not given any painkillers for his injuries until September 8, 2011, when he was given

---

[7] The timestamps do not appear to be perfectly synchronized between different cameras, as the camera from the video "Pod 3C North 1" shows Mr. Greene leaving his cell at 10:10.

Motrin. (Doc. 116-1 at ¶ 141). He states that he suffered vision difficulties, headaches, memory and concentration issues, and nightmares. (*Id.* at ¶ 130). He also affirms that he has "undergone years of psychological and physical pains and sufferings" from the beatings. (*Id.* at ¶ 167).

In a health service request dated October 23, 2011, Mr. Greene reported slight headaches, blurry vision, dizzy spells, and nightmares. (Doc. 118 at 201). He was seen the next day by a provider, who wrote that in person Mr. Greene repeated only the complaint about slight headaches, which could be relieved by Motrin. (*Id.* at 202).

The defendants deny hearing Mr. Greene ask for his inhaler or for medical attention and deny that he was injured. Officer Ross, who escorted Mr. Greene both to SHU and to medical, declared that Mr. Greene "was not in any visible discomfort or pain" and that he "did not hear Detainee Greene ask for an inhaler or food at any time." (Doc. 96-1 at p. 59 ¶ 20). Sergeant Holloway never observed Mr. Greene unconscious, (*id.* at p. 168), and never heard him request his inhaler. (*Id.* at p. 164). Officer Minor observed no visible injuries and did not hear any request for an inhaler or medical aid. (*Id.* at p. 34 ¶ 9). Officer Johnson states that Mr. Greene never made any statements about asthma. (*Id.* at p. 198). Sergeant Jones stated that he had "no knowledge" of a request for medical treatment. (*Id.* at p. 245). The defendants submitted no evidence as to whether Staff Sergeant Collier was aware of Mr. Greene's injuries or medical needs. (*Id.* at pp. 21-24, 131-140). Officer Moore declared that he saw no "visible bleeding, limping or evidence of injury" on Mr. Greene at any time, (*id.* at p. 45 ¶ 10), and that he

"does not recall" the number of times he heard Mr. Greene ask for an inhaler or say that he had trouble breathing. (*Id.* at p. 302).

Officer Ross explains why he provided Mr. Greene with two copies of the injury report. On the first version, Mr. Greene "did not describe an injury but alleged being assaulted. I asked Detainee Greene to describe any injuries in the injury report and gave him a new form for the purpose of reporting any injuries. Detainee Greene refused to provide an injury on the injury report and he refused to sign the inmate certification on the injury report attached hereto as an exhibit." (*Id.* at p. 59 ¶ 21; *see also id.* at p. 102). Officer Ross does not say what happened to the first report.

<u>Disciplinary Hearing and Grievances</u>

Mr. Greene asserts that his disciplinary hearing violated his rights because he was denied assistance in gathering the names of potential witnesses and the names of officers while he continued to be isolated and prevented from leaving his cell. (Doc. 116-1 at ¶¶ 113-14). He maintains that he requested of Sergeant Weaver, who helped conduct his disciplinary hearing, (Doc. 96-1 at p. 120 ¶ 10), that the two inmates who had slept adjacent to his original cell be called as witnesses and that he did not waive his right to advance notice of the hearing, which would have allowed him more time to prepare. (Doc. 116-1 at ¶ 114). He declares that he informed Sergeant Brown, who oversaw the disciplinary hearing, (Doc. 96-1 at pp. 118-19 ¶ 6), that he was not ready to proceed and that he requested a continuance. (Doc. 116-1 at ¶ 117). Mr. Greene states that he never received an answer to his administrative appeal of the disciplinary hearing process, (*id.* at ¶ 122; *see also* Doc. 118 at 107 (appeal form)), and that Sergeant Brown received his

17

complaints and grievances concerning the appeal and intentionally did not answer them or forward them to another staff member. (Doc. 116-1 at ¶ 124).

Mr. Greene states that he filed numerous other complaints relating to the same incident, (*e.g.*, *id.* at ¶¶ 143-45), and that on January 20, 2012, he received a letter from Chris Wood, a state jail consultant, stating that his department could not substantiate the claims and had no record of any appeal of the disciplinary hearing. (*Id.* at ¶ 146).

Sergeant Brown declared that Mr. Greene received and signed a Notice of Infraction that gave him an opportunity to list witnesses to be called on his behalf and that Mr. Greene failed to identify any witnesses. (Doc. 96-1 at pp. 119-20 ¶¶ 7-9; *see also id.* at p. 112). After the hearing, Sergeants Brown and Weaver concluded that the following charges were sustained against Mr. Greene: "acting insolent toward personnel," "using abusive language," "failing to comply with official's lawful order," and "acting in a way that interferes with the orderly running of the facility." (*Id.* at pp. 119, 121 ¶¶ 7, 12). The charges of "disrupting shakedown" and "attempting to intimidate staff" were not sustained. (*Id.*).

Sergeant Brown affirmed that Mr. Greene was advised of his appeal rights and that Mr. Greene did appeal the disciplinary process. (*Id.* at p. 121 ¶ 12). Neither Sergeant Brown nor any of the other defendants have said what happened to Mr. Greene's appeal or why there is no further record of it.

<u>Retaliation</u>

Mr. Greene declares that he lost three "walks," which are privileges to leave the cell for things like showering, using a pencil and paper, exercising, and using the

telephone. (Doc. 116-1 at ¶ 104; p. 52 note). He asserts that these walks were taken away by Officer Elliott for the purpose of punishment, retaliation, and keeping him isolated. (*Id.* at ¶¶ 106-07). He alleges that the disciplinary infraction was retaliatory and false. (*Id.* at ¶ 112). Mr. Greene asserts that Officer Minor and Sergeant Holloway, on two unspecified occasions, denied him access to the day-room or multipurpose room for Islamic studies when members of other religions were permitted to use the room for religious studies. (*Id.* at ¶ 149). He asserts generalized dissatisfaction with his treatment by detention center staff and attributes this alleged mistreatment to his religion. (*See id.* at ¶¶ 152-55).

The defendants deny taking retaliatory actions against Mr. Greene generally, (*e.g.*, Doc. 96-1 at p. 12 ¶ 20; p. 35 ¶ 13; p. 47 ¶ 18), but they do not address the facts related to Mr. Greene's specific allegations of retaliation.

## III.  Analysis

Neither Mr. Greene's amended complaint, (Doc. 58), his brief in opposition to summary judgment, (Doc. 116), nor his declaration supporting that brief, (Doc. 116-1), do a very good job of explaining which claims Mr. Greene, who proceeds pro se, intends to raise against which defendants. Indeed, his brief in opposition does not address all his claims. (Doc. 116). Out of an abundance of caution, the Court will evaluate each claim against each moving defendant.

### A. Conditions of Confinement

Conditions of confinement of pretrial detainees in state custody are evaluated under the due process clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441

U.S. 520, 535 (1979). "The due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections available to the convicted prisoner." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). The nature of claims brought under the Eighth and Fourteenth Amendments differs because "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015).

Mr. Greene raised four Fourteenth Amendment claims related to the conditions of confinement: a claim of excessive force; a claim for failure to supervise; a claim for "inhumane and unsanitary conditions" in his cell in SHU; and a claim for deliberate indifference to a serious medical need in connection with the delay in medical treatment.

Summary judgment will be denied to all moving defendants except Officer Johnson on the excessive force claim. Summary judgment will be denied to Sergeant Holloway and Staff Sergeant Collier and granted as to all other defendants on the failure to supervise claim. Summary judgment will be granted to all defendants on the claim related to the conditions of confinement in SHU. Summary judgment will be denied to all defendants on the claim of deliberate indifference to a serious medical need.

## 1.    Excessive Force

A pretrial detainee seeking to prove an excessive force claim need only show that the officers' use of force was objectively unreasonable. *Kingsley*, 135 S. Ct. at 2470. A plaintiff can "prevail by showing that the [defendants'] actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at 561).

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight. *Mills v. Rich*, No. 7:13-CV-138-BO, 2015 WL 5139198, at *4 (E.D.N.C. Sept. 1, 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The following considerations, among others, may bear on the reasonableness or unreasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396).

Mr. Greene asserts that the defendants used excessive force against him by beating and kicking him when he was lying handcuffed on the floor, despite the fact that he had cooperated with the orders to sit down, be quiet, and submit to handcuffs. (Doc. 116 at 8-9). The defendants deny this, and maintain that Mr. Greene refused to follow verbal commands, exhibited combative behavior, and was handcuffed and escorted from his cell using appropriate force. (Doc. 96 at 12).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

Here, neither the video evidence nor the medical records so "blatantly" contradict Mr. Greene's entire version of events that the Court should set Mr. Greene's affirmation of facts aside completely. While Mr. Greene's expansive narration could be interpreted as describing a much more prolonged ordeal, which is contradicted by the video evidence showing that the incident took only a couple minutes, the video shows that a number of officers were inside Mr. Greene's cell for about two minutes, during which time their actions were not visible on camera and after which Mr. Greene was led out of his cell with no pants on. *See Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276-77 (4th Cir. 2011) (noting that *Scott* does not hold that courts must reject a plaintiff's account on summary judgment whenever a video offers *some* support for the defendant's version of events, particularly where the video fails to capture the part of the incident where the plaintiff sustained his injuries). The video does not so explicitly contradict Mr. Greene's version that no reasonable jury could find that guards assaulted him. Nonetheless, the videos do show that some of Mr. Greene's factual claims are obviously inaccurate, and in those limited instances the Court will assume the accuracy of the videos, which Mr. Greene has not contested.

Therefore, taking the facts in the light most favorable to Mr. Greene as the non-moving party, the Court will examine each of the *Kingsley* factors.

First, the relationship between the need for the use of force and the amount of force used weighs in Mr. Greene's favor. Mr. Greene maintains that he initiated a discussion with Sergeant Holloway "in a cool, calm, and collect[ed] manner" about the fact that his cell was left a mess after it was searched. (Doc. 116-1 at ¶ 30). He asserts

that she told him to wait and that she would be back, and it was only after she left that Mr. Greene realized his meal was missing.  (*Id.* at ¶ 31).  He also asserts that she came back to his cell before other officers arrived.  (*Id.* at ¶ 34).  These assertions are contradicted by the video evidence.  The video shows that Sergeant Holloway was on the lower level of Pod 4D when Mr. Greene returned to his cell on the upper level after the search and that she remained on the lower level until after several other officers had responded to Mr. Greene's cell.  (*See* Video "Pod 4D 1," timestamp 8:48:40-49:10; *see also* Doc. 96-1 at p. 10 ¶ 9).

If Mr. Greene initiated a conversation with Sergeant Holloway while he was locked in his cell and she was on the lower level, it seems clear that he would have needed to shout.[8]  Assuming that Mr. Greene did yell at Sergeant Holloway and other guards, the relationship between that and the amount of force with which he maintains the guards responded still weighs in his favor.  Mr. Greene denies clenching his fists, attempting to intimidate detention officers, disobeying lawful orders, and swinging, striking, kicking, or attempting to hit the officers.  (Doc. 116-1 at ¶ 44).  He asserts that numerous detention officers encouraged Officer Minor to beat him, (*id.* at ¶ 46), that he was hit, shoved, and kicked, (*id.* at ¶¶ 40-42, 51-56), that he was then handcuffed, (*id.* at ¶ 57), that Sergeant Jones threatened to kill him and punched him so hard he lost

---

[8] Sergeant Holloway affirms that is what happened: she states that Mr. Greene was yelling profanities to the lower level of the Pod and banging on the cell door loudly and that she told him to quiet down and that she would come up to his cell after the search.  (Doc. 96-1 at p. 10 ¶ 10).

23

consciousness, (*id.* at ¶ 64), that Officer Elliott stomped on his face, (*id.* at ¶¶ 70, 73-74), and that Officer Elliott then choked him using his own shirt. (*Id.* at ¶¶ 75-78).

The use of force Mr. Greene describes is wildly out of proportion with the need for force to address a detainee who, while locked alone in a cell, is yelling at guards, even if the detainee fails to comply with a command to quiet down. This is particularly so for the portions of the assault that occurred after Mr. Greene had been handcuffed and if one accepts Mr. Greene's affirmations under oath that he was compliant. "It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (citations omitted).

The second *Kingsley* factor, the extent of the plaintiff's injury, weighs somewhat in the defendants' favor. The videos reflect that Mr. Greene was able to walk on his own and are inconsistent with the kind of serious, sustained assault Mr. Greene says occurred, but they otherwise are not clear enough to show whether Mr. Greene is injured or not. (*E.g.*, Video "Medical Entrance," timestamp 10:08:11-16); *see Witt*, 633 F.3d at 276-77. Moreover, the medical records he submitted say he suffered from "head trauma." (Doc. 118 at 100).[9] It is possible for a reasonable fact-finder to conclude on this record that Mr.

---

[9] Mr. Greene has apparently continued to report a history of head injury or concussion to other medical providers, who note it in their reports. (*E.g.*, Doc. 121-1 at 24, 30). However, these medical records do not substantiate Mr. Greene's assertions about his injuries; they merely reflect his consistency in reporting a head injury to medical providers.

Greene suffered bruising, soreness, and a head injury. Nonetheless, the record reflects that these injuries were relatively minor, so this factor weighs in favor of the defendants.

The remaining *Kingsley* factors, "any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," 135 S. Ct. at 2473, all cut in favor of Mr. Greene when the Court views the record in the light most favorable to him. As noted *supra*, Mr. Greene specifically denies resisting, threatening, or disobeying officers. The defendants assert that there is an increased security risk on the upper level of the facility, where Mr. Greene's cell was located, which justifies the response of multiple officers to the scene of the disruption. (*E.g.*, Doc. 96-1 at pp. 21-22 ¶ 5). Still, reasonable officers could not reasonably perceive such a threat as justifying punching Mr. Greene in the head after he is handcuffed, stepping on his face while he is immobile on the floor, or encouraging other officers to beat him up.

In their reply brief, the defendants argue the facts. ("[O]fficers used only the force necessary to diffuse the disturbance plaintiff was causing by kicking the door and yelling and to subdue and handcuff plaintiff who was combative toward the officers." (Doc. 124 at 8)). They make no argument that they would be entitled to summary judgment if the plaintiff's facts were believed. Furthermore, Mr. Greene was acquitted at his disciplinary hearing of "attempting to intimidate staff." (Doc. 96-1 at pp. 119, 121 ¶¶ 7, 12).

There is evidence from Mr. Greene and other witnesses that Sergeant Holloway, Sergeant Jones, Officer Minor, Officer Ross, Staff Sergeant Collier, and Officer Moore were present in or just outside his cell and from Mr. Greene that all of these officers

either participated in the excessive force and assault or encouraged it. Therefore, the Court denies the summary judgment motion of these defendants as to the Fourteenth Amendment excessive force claim.

There is no evidence that Officer Johnson was present in or near Mr. Greene's cell where the alleged assault took place. Therefore, summary judgment will be granted in her favor as to the Fourteenth Amendment excessive force claim.

The defendants' affirmative defense of qualified immunity will be denied for the same reasons. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In analyzing qualified immunity, the Court must consider (1) "whether a constitutional violation occurred," and (2) "whether the right violated was clearly established at the time of the official's conduct." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (internal quotations omitted).

The fact that pretrial detainees have a Fourteenth Amendment Due Process right to be free from excessive force, which is balanced against the legitimate interests that stem from the government's need to manage the detention facility, has long been clearly established. *Bell*, 441 U.S. at 538-40. It is also beyond dispute that it is excessive force to beat up a compliant inmate for over two minutes merely because the detainee was disruptive and yelling earlier. While the Court appreciates that the defendants deny Mr. Greene's version of events and that Mr. Greene's version has some serious credibility

26

problems, those disputes are not relevant to the qualified immunity issue, which assumes the truth of the plaintiff's version. The defendants are not entitled to qualified immunity.

## 2.    Failure to Supervise

To state a claim for supervisory liability under 42 U.S.C. § 1983, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Moody v. City of Newport News*, 93 F. Supp. 3d 516, 540-41 (E.D. Va. 2015) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Mr. Greene stated in his amended complaint that his claim was for "failure to intervene while Plaintiff was getting beat by guards/supervisory liability claims/stand-by theory (failing to help/stop)." (Doc. 58 at 6).

Mr. Greene has not pointed the Court to any evidence indicating that anyone other than Sergeant Holloway and Staff Sergeant Collier were supervisors. To the extent that Mr. Greene is asserting a supervisory liability claim against defendants Sergeant Jones, Officer Minor, Officer Ross, Officer Johnson, and Officer Moore, summary judgment will be granted to those defendants.[10]

---

[10] It appears from the record that Officer Elliott, who did not move for summary judgment, was likewise not a supervisor, and the Court does not read the amended complaint to assert any supervisory liability claim against Officer Elliott.

27

The evidence reflects that Sergeant Holloway and Staff Sergeant Collier were both supervisors on duty during the time of the alleged beating. (*See* Doc. 116-1 at ¶ 69; Doc. 96-1 at p. 9 ¶ 4; p. 21 ¶ 4).[11] Taking the facts in the light most favorable to Mr. Greene, summary judgment will be denied as to the supervisory liability claims against Sergeant Holloway and Staff Sergeant Collier.

The video shows that Sergeant Holloway was present in the area while officers were inside Mr. Greene's cell, (Video "Pod 4D 1," timestamp 8:49:26), and she admits entering his cell during the incident. (Doc. 96-1 at p. 11 ¶ 12). While Staff Sergeant Collier does not say exactly where he was when other officers were inside Mr. Greene's cell, it is clear he was nearby as he observed officers respond to the cell. (*Id.* at pp. 22-23 ¶ 8). Mr. Greene's declaration states that both supervisors were present and watched him being attacked and that in the case of Sergeant Holloway, she did nothing to intervene or prevent it and in the case of Staff Sergeant Collier, he joined in the beating.

These facts, if believed, are sufficient to establish knowledge, deliberate indifference or tacit authorization, and causation. *See Shaw*, 13 F.3d at 799 (noting that "proof of causation . . . may be supplied by [the] tort principle that holds a person liable for the natural consequences of his actions."). Given both supervisors' proximity to the alleged assault and the severe nature of the assault as alleged by Mr. Greene, there is a

---

[11] Claims against former Sheriff Worth Hill and Sheriff Michael Andrews have already been dismissed. (Doc. 22).

genuine issue of material fact requiring a trial on the supervisory liability claims against these two officers.

### 3.    Inhumane and Unsanitary Conditions

Mr. Greene asserts that he was subjected to "inhumane and unsanitary conditions." (Doc. 58 at 5).  Though not completely clear, it appears that he intends to raise this claim in connection with the strip search that preceded the alleged assault and with respect to the conditions of his cell in SHU after the assault.  Because Mr. Greene failed to exhaust his administrative remedies on this claim of inhumane and unsanitary conditions, summary judgment will be granted to the moving defendants.

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust administrative remedies before filing a lawsuit under § 1983.  *See* 42 U.S.C. § 1997e(a). It applies to pretrial detainees.  *Kingsley*, 135 S. Ct. at 2476.  There are no "special circumstances" that can excuse the mandatory exhaustion requirement.  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  The record reflects that Mr. Greene submitted numerous grievances (*e.g.*, Docs. 26-3; 26-4; 119 at 35-48), but he did not mention his objections to the strip search or the conditions of his cell in SHU.

Moreover, Mr. Greene has not offered evidence sufficient to support this claim. Therefore, summary judgment is granted to all the moving defendants on the inhumane and unsanitary conditions claim.

### 4.    Inadequate Medical Care

Mr. Greene asserts that the defendants' failure to provide timely and adequate medical care amounted to a deliberate indifference to a serious medical need.  (Doc. 58 at

6). The defendants' summary judgment motion will be granted to the extent Mr. Greene is seeking to recover for the actual medical care delivered but denied to the extent his claim is based on failure by the defendants to provide prompt access to care.

There is no evidence that any of the defendants work in the medical unit or have any responsibility for directly providing medical care. While Mr. Greene complains about the treatment he received from a various health care providers in the medical unit, none of these providers is a defendant. No evidence indicates that any of the defendants have supervisory authority over the medical unit. To the extent Mr. Greene is asserting a claim based on the quality of the medical care he did receive, the motion for summary judgment will be granted.

However, to the extent the claim is based on the defendants' reaction to Mr. Greene's alleged requests for medical treatment during the period of eighty minutes between the time of the alleged assault and when they took him to the medical unit, the motion will be denied. "[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations omitted). "An officer is deliberately indifferent only when he 'knows of and disregards' the risk posed by the serious medical needs of the inmate." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). The Fourth Circuit has identified two aspects of the official's state of mind that must be shown to satisfy the subjective component. "First, *actual knowledge of the risk of harm* to the inmate is required. . . . [And,] the officer must *also* have recognized that *his actions were*

30

*insufficient* to mitigate the risk of harm to the inmate arising from his medical needs." *Iko*, 535 F.3d at 241 (internal quotations omitted) (citing *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)).

Taking the record in the light most favorable to Mr. Greene, the Court finds that material issues of fact preclude summary judgment on the deliberate indifference claim. The defendants assert that the surveillance videos show that Mr. Greene "was not bleeding or limping and had no visible injury." (Doc. 96 at 13). While this is true as far as it goes, the videos are so low quality and difficult to see that they do not definitively establish that Mr. Greene's version of the facts cannot be true. The clearest video, which shows Mr. Greene entering the medical unit, displays a reasonably unobstructed view of the left side of Mr. Greene's face, which is the side he alleges was punched and then stomped. (Doc. 116-1 at ¶¶ 64, 73-74). However, even this video is jerky, pixelated, and dim. (Video "Medical Entrance," timestamp 10:08:02-16). It does not blatantly contradict Mr. Greene's account that he suffered a head injury and needed his inhaler. *See Witt*, 633 F.3d at 276-77.

Moreover, in their reply brief the defendants again confine themselves to arguing their version of the facts, rather than asserting that they are entitled to summary judgment even on Mr. Greene's facts. (Doc. 124 at 10). They have submitted no case asserting that asthma is not a serious medical need nor that suffering a blow to the head that results in momentary unconsciousness is not a serious medical need.

Summary judgment is denied as to all the defendants on the deliberate indifference claim.

## B. Due Process

Mr. Greene asserts that he was denied due process in the matter of his disciplinary hearing because officers did not assist him in identifying the names of possible witnesses or the names of the officers, because officers did not grant him a continuance, and because they failed to investigate his version of events. (Doc. 116-1 at ¶¶ 116-19). He also asserts that although he promptly appealed the result of his disciplinary hearing, (*see* Doc. 118 at 107), and tried numerous times to follow up, (*e.g.*, Doc. 26-3), he never received any information about his appeal and was later told that it was never filed. (Doc. 116-1 at ¶ 122).

The defendants assert that Mr. Greene may not pursue any claims related to the disciplinary process, (Doc. 124 at 5), because the magistrate judge previously held that "allegations that Major Couch improperly handled Plaintiff's grievances do not form the basis of a separate constitutional claim, as an inmate has no constitutional right to participate in grievance proceedings." (Doc. 111 at 3 (citing *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994)). This argument by the defendants misconstrues and takes out of context the magistrate judge's ruling, which in no way established that Mr. Greene has no right to due process in the matter of a disciplinary hearing that resulted in additional deprivations to his liberty. (*See* Doc. 96-1 at p. 121 ¶ 12 (describing punishments)).

Though "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply,"

prisoners may "claim the protections of the Due Process Clause," to prevent additional deprivations of life, liberty, or property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). "*A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell*, 441 U.S. at 545.

To succeed on his due process claim, Mr. Greene must show "he was denied a liberty interest protected by the Due Process Clause . . . ; this denial imposed on him an atypical and significant hardship in relation to the ordinary incidents of prison life; and the process that the state prison employed was constitutionally inadequate." *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (internal citations and quotations omitted) (citing *Wilkinson v. Austin*, 545 U.S. 209, 220-21 (2005).

Mr. Greene has made no showing that the defendants Sergeant Jones and Officers Ross, Minor, Johnson, and Moore were involved in the disciplinary hearing.[12] Summary judgment is granted as to those defendants on the due process claim.

Mr. Greene maintains that Sergeant Holloway and Staff Sergeant Collier deliberately lied on infraction forms they submitted in advance of the hearing. (*See* Doc. 116-1 at ¶ 112; *see also* Doc. 96-1 at 107-08 (infraction reports)). However, the disciplinary hearing only resulted in Mr. Greene being placed in disciplinary segregation for thirty days and the removal of other privileges. (Doc. 96-1 at p. 121 ¶ 12; Doc. 26-2).

---

[12] It appears from the record that Officer Elliott, who did not move for summary judgment, was not involved in the disciplinary hearing, and the Court does not read the amended complaint to assert any claim related to that hearing against Officer Elliott.

These are not necessarily "atypical and significant hardship[s] . . . in relation to the ordinary incidents of prison life" that "conceivably create a liberty interest." *Sandin*, 515 U.S. at 484, 486 (holding that discipline in segregated confinement is not atypical significant deprivation giving rise to a liberty interest). Even if they were, harsh conditions alone do not give rise to a state-created liberty interest in their avoidance. *See Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015). Therefore, summary judgment will be granted as to these two defendants as well.

Defendant Sergeant Stanley Brown, who did not move for summary judgment, presided over the disciplinary hearing along with Sergeant Weaver, who is not a defendant. (Doc. 96-1 at p. 119 ¶ 6). Because it appears Mr. Greene cannot succeed on this claim against Sergeant Brown, and because none of his other claims are directed against Sergeant Brown, the Court gives notice of its intent to dismiss the case against Sergeant Brown unless Mr. Greene can show a legal basis for his claim. Mr. Greene may file a brief no longer than eight pages limited to the due process claim against Sergeant Brown arising out of the disciplinary hearing no later than September 23, 2016. A brief longer than eight pages will be stricken and not considered. Mr. Greene need not refile evidence already before the Court. If Mr. Greene files such a brief, Sergeant Brown may file a response no longer than eight pages no later than October 14, 2016.

### C. Practice of Religion Claims

Mr. Greene claims that the defendants violated his right to practice his religion under the First Amendment and under RLUIPA. (Doc. 58 at 5-6). Though it is not

entirely clear, it appears that this claim is based on the fact that an unknown officer[13] threw away Mr. Greene's Ramadan meal on August 21, 2011, and that Sergeant Holloway did not give Mr. Greene any replacement meal. (*See* Doc. 96-1 at p. 12 ¶ 19).

While it is highly doubtful that Mr. Greene could survive summary judgment on the merits of this claim,[14] the Court need not reach that issue because Mr. Greene failed to exhaust his administrative remedies. As noted, PLRA requires prisoners to exhaust administrative remedies before filing a lawsuit under § 1983 or any other federal law. *See* 42 U.S.C. § 1997e(a). And although it appears clear from the record that the detention facility officers were generally aware that Mr. Greene was upset about the loss of his Ramadan meal, there are no "special circumstances" that can excuse the mandatory exhaustion requirement. *Ross*, 136 S. Ct. at 1856. The record reflects that Mr. Greene submitted numerous grievances (*e.g.*, Docs. 26-3; 26-4; 119 at 35-48), but he did not mention the disposal of his religious meal.

Summary judgment is granted to all defendants on the First Amendment free exercise claim and the RLUIPA claim.

### D. First Amendment Retaliation Claim

---

[13] None of the defendants were involved in the search of Mr. Greene's cell or the disposal of his Ramadan meal. (Doc. 96-1 at p. 10 ¶ 6; p. 22 ¶ 6; p. 33 ¶ 6; p. 44 ¶ 4; p. 56 ¶ 7; p. 124 ¶ 7; p. 128 ¶ 5).

[14] Under Mr. Greene's version of the facts, the unknown officer threw away part of one meal during a search of a cell well after the meal was served. It is hard to see how this supports a showing that the unknown officer acted "intentionally" to place a substantial burden on Mr. Greene's exercise of religion. *See Wall v. Wade*, 741 F.3d 492, 502 (4th Cir. 2014).

Mr. Greene asserts that the defendants retaliated against him for filing grievances and stating his intention to file grievances, in violation of his First Amendment rights. (Doc. 58 at 6). In their brief supporting their motion for summary judgment, the defendants demonstrate that they understand that Mr. Greene's claim alleges retaliation for filing grievances, but in a seeming non-sequitur, they then argue that they are entitled to summary judgment because he was not engaging in protected speech while yelling profanities at officers. (Doc. 96 at 19). Whether or not Mr. Greene yelled profanities at officers is a disputed fact, but even if true, it is not the basis for his retaliation claim.

Claims of retaliation must implicate a right that exists under the Constitution. "That is, plaintiffs must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams*, 40 F.3d at 75. As noted, the "Constitution creates no entitlement to grievance procedures," *id.*, and so Mr. Greene's retaliatory action claim can only proceed if the allegedly retaliatory act itself violated a constitutional right.

Mr. Greene has asserted a number of retaliatory actions, including those associated with the inhumane conditions claim on which the Court granted summary judgment due to failure to exhaust and with the Due Process Clause claim on which the Court granted summary judgment because Mr. Greene did not establish a violation of a liberty interest. Summary judgment will be granted to the extent the retaliation claim implicates those allegedly retaliatory acts.

Mr. Greene also asserts that Officer Minor and Sergeant Holloway, on two unspecified occasions, denied him access to the day-room for Islamic studies, when

36

members of other religions were permitted to use the room for religious studies.  (Doc. 116-1 at ¶ 149).  He filed a grievance on that issue, asserting that he was being denied use of the multipurpose room for Islamic studies when "other religious denominations get easy everyday access without question."  (Doc. 119 at 48).[15]  The defendants submitted no evidence to the contrary and have made no legal argument related to this claim in support of their motion.  (*See* Doc. 124).[16]  Therefore, summary judgment will be denied as to Officer Minor and Sergeant Holloway on this narrow aspect of the retaliation claim.

## IV.     Motion in Limine

Mr. Greene also submitted a motion in limine seeking the exclusion at trial of his criminal history and civil litigation history.  (Doc. 99).  This motion will be denied as premature, without prejudice once the case is set for trial.

---

[15] The grievance form shows that the response to Mr. Greene's complaint was the enigmatic "Group assigned changed to security."  (Doc. 119 at 48).  The grievance was closed without further comment about a month later.  (*Id.*).  There is no evidence about whether Mr. Greene appealed the closure of his grievance.  PLRA exhaustion requires "proper" exhaustion, meaning "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)."  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).  However, failure to exhaust is an affirmative defense, *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 683 (4th Cir. 2005), and the defendants have not demonstrated that Mr. Greene failed to appeal in connection with his multipurpose room complaint.

[16] It is not the Court's duty to make arguments or do research for any party.  *See Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("[I]t is not this court's responsibility to research and construct the parties' arguments."); *Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

## V.     Conclusion

The case will proceed to trial on excessive force claims against Sergeants Holloway and Jones, Staff Sergeant Collier, and Officers Minor, Ross, and Moore; failure to supervise claims against defendants Sergeant Holloway and Staff Sergeant Collier; deliberate indifference to a serious medical need against Sergeants Holloway and Jones, Staff Sergeant Collier, and Officers Minor, Ross, Moore, and Johnson; and retaliation claims against Sergeant Holloway and Officer Minor.  The Court anticipates dismissing the only claim against Sergeant Brown for violation of due process rights during the disciplinary hearing, unless Mr. Greene shows cause to the contrary.

Mr. Greene's claims against non-moving defendant Officer Elliott for excessive force, unsanitary and inhumane conditions, deliberate indifference to a serious medical need, violations of the right to practice religion under the First Amendment and RLUIPA, and retaliation will proceed to trial.  While some of these claims will likely be dismissed at the close of the plaintiff's evidence for the same reasons stated herein, these claims against Officer Elliott arise out of the same incident as the remaining claims against other defendants, and trial of those issues will not lengthen the presentation of evidence.

It is **ORDERED** that the defendant's motion for judgment as a matter of law, (Doc. 95), is **GRANTED in part** and **DENIED in part** as stated herein, and the plaintiff's motion in limine, (Doc. 99), is **DENIED**.  Specifically:

1.      On the claim of excessive force in violation of the Fourteenth Amendment, summary judgment is **DENIED** to defendants Tara Holloway, Augustus

38

Collier, Harry Minor, Michael Jones, Edward Ross, and Herschel Moore and **GRANTED** to defendant Comeshia Johnson.

2.     On the claim of failure to supervise, resulting in excessive force in violation of the Fourteenth Amendment, summary judgment is **DENIED** to defendants Tara Holloway and Augustus Collier, and **GRANTED** to defendants Comeshia Johnson, Harry Minor, Michael Jones, Edward Ross, and Herschel Moore.

3.     On the claim of unsanitary and inhumane conditions in violation of the Fourteenth Amendment, summary judgment is **GRANTED** to defendants Tara Holloway, Augustus Collier, Harry Minor, Michael Jones, Edward Ross, Herschel Moore, and Comeshia Johnson.

4.     On the claim of deliberate indifference to a serious medical need in violation of the Fourteenth Amendment, summary judgment is **DENIED** to defendants Tara Holloway, Augustus Collier, Harry Minor, Michael Jones, Edward Ross, Herschel Moore, and Comeshia Johnson.

5.     On the claim of violations of due process in connection with the disciplinary hearing, summary judgment is **GRANTED** to defendants Tara Holloway, Augustus Collier, Harry Minor, Michael Jones, Edward Ross, Herschel Moore, and Comeshia Johnson.

6.     On the claim of violations of the right to practice religion under the First Amendment, summary judgment is **GRANTED** to defendants Tara

Holloway, Augustus Collier, Harry Minor, Michael Jones, Edward Ross, Herschel Moore, and Comeshia Johnson.

7.     On the claim of violations of the right to practice religion under the Religious Land Use of Institutionalized Persons Act, summary judgment is **GRANTED** to defendants Tara Holloway, Augustus Collier, Harry Minor, Michael Jones, Edward Ross, Herschel Moore, and Comeshia Johnson.

8.     On the claim of retaliation in violation of the First Amendment, summary judgment is **GRANTED** to defendants Augustus Collier, Michael Jones, Edward Ross, Herschel Moore, and Comeshia Johnson, and **DENIED** to defendants Tara Holloway and Harry Minor.

9.     The Court anticipates dismissing the due process claim against defendant Brown unless Mr. Greene shows a legal basis for that claim in a brief no longer than eight pages to be filed no later than September 23, 2016.  If Mr. Greene files such a brief, Sergeant Brown may file a response no longer than eight pages no later than October 14, 2016.

10.    The plaintiff Alonzo Greene's motion in limine, (Doc. 99), is **DENIED** as premature, without prejudice.

11.    The Clerk is directed to set this matter for trial.

This the 26th day of August, 2016.

_____
UNITED STATES DISTRICT JUDGE